# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ROBERT BEAUDET, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 14-112S |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

This matter is before the Court on the motion of Plaintiff Robert Beaudet for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Supplemental Security Income ("SSI") under § 1631(c)(3) of the Social Security Act, 42 U.S.C. § 1383(c)(3) (the "Act"). Plaintiff contends that the Administrative Law Judge ("ALJ") committed reversible error by giving insufficient weight to the opinion of his treating psychiatric nurse and by failing properly to assess Plaintiff's credibility regarding the functional limitations that are caused by his psychiatric impairments. The motion of Defendant Carolyn W. Colvin asks the Court to affirm the Commissioner's decision. These motions have been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record, I find that the ALJ's findings are sufficiently supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

## I.    Background

### A.    Introduction

As of his date of alleged onset (March 12, 2011), Plaintiff was a fifty-two-year-old veteran diagnosed with depression, post-traumatic stress disorder ("PTSD") and bipolar disorder, together with an array of physical ailments including diabetes, Hepatitis C and low back pain. Tr. 19-20, 167, 197, 793.  His mental health history began in childhood, when he and his family became involved with the Rhode Island Department of Children, Youth and Families and he was referred for treatment.  During this, his first psychiatric intervention, an adult counselor made serial attempts to sexually molest him.  Tr. 789.  Plaintiff claims that this encounter negatively impacted his willingness to seek psychiatric treatment and is part of the reason for his declination during the period of alleged disability of mental health treatment beyond what had been successfully prescribed in the past.  Tr. 261, 789.

In childhood, Plaintiff enjoyed drawing, photography and the arts and exceled at sports, though he also was withdrawn and socially isolated.  Tr. 789.  After high school, Plaintiff hoped to attend the Rhode Island School of Design but for financial reasons joined first the National Guard and then the regular Army, working as a photographer.  Tr. 789.  Plaintiff served in the military from 1977 until 1983 and was honorably discharged.  While in military service, he began to abuse alcohol and to use various controlled substances, including LSD, cocaine, marijuana, heroin, prescription pills and mescaline.  Tr. 789-90.  After discharge, Plaintiff's use of illicit substances decreased, ending completely in 2000; he stopped all use of alcohol in 2009 when he learned he had liver inflammation.  Tr. 74-75.  From April 2010, ending in March 2011, Plaintiff was treated successfully for Hepatitis C.  Tr. 260, 262.  As a veteran, Plaintiff has gotten

health care treatment at the Department of Veterans Affairs Medical Center ("VA"), except for treatment following a motor vehicle accident at Rhode Island Hospital.

After discharge from the Army, Plaintiff worked a cleaner, laborer, machine operator and mechanic; some of this work was skilled, such as making dental molds and fabricating truck bodies. After he stopped working at traditional jobs in 2000, Plaintiff continued to generate income by doing home repairs and masonry and painting signs and murals until the physical work became too much for him. Tr. 198, 790. In his first function report in connection with this application, he represented that he had never been fired or laid off from any job because of problems getting along with others; this answer changed in the function report completed after his application was denied initially. Tr. 211, 236.

Throughout the period of alleged disability, Plaintiff has been effectively homeless. Since 2008, with the consent of the owner, whom he describes as his only friend, he has lived in the basement of a vacant tenement in Woonsocket, with only sporadic access to utilities. Tr. 69, 73, 790. When the weather was too cold and during the period when Plaintiff was recovering from the after-effects of a motor vehicle accident in December 2011, he lived with his mother, with a friend and then in a homeless shelter. Tr. 728, 733. In the face of urging by VA providers that he procure reliable housing, Plaintiff insisted that he prefers the basement because he wants to be isolated from other people who make him angry. Tr. 260; see Tr. 261("For about 40 years he has used social isolation and a solitary lifestyle to manage his symptoms."). Plaintiff describes himself as "almost totally a hermit for a basic inability to interact," who has "absolutely as little social contact as possible." Tr. 205, 210.

Although he no longer draws, Plaintiff has continued to enjoy books and the arts and often spends hours at the library reading and using the computer to research matters of interest to

him; he testified that he recently completed a multi-volume set of books by author Stephen King. Tr. 70-72. As he describes his own strengths, "I'm intelligent and I'm a survivor. I'm headstrong and sometimes that works for me and sometimes against." Tr. 730. Despite his professed dislike of others, except for an Article 15 in the Army for failing to get a new ball cap and truancy as a child, Plaintiff has never had any criminal involvement and has never been referred for hospitalization, hospitalized or sent to an emergency room for psychiatric treatment. Tr. 788-93.

The current SSI application was filed on July19, 2011, and is not Plaintiff's first attempt at applying for Social Security benefits. Tr. 9. A prior set of applications (SSI and Disability Insurance Benefits ("DIB")) was denied on March 11, 2011; the alleged onset date for the current application (March 12, 2011) is the day after the prior application was denied. Tr. 9, 193. In the current application, Plaintiff alleges that he is disabled due to hearing loss, liver problems, diabetes, back pain, bipolar disorder, PTSD and hypertension. Tr. 197. Because only his mental health impairments are in issue on this appeal, they will be the focus of this report and recommendation.

### B.    Mental Health History

Virtually all of Plaintiff's mental health treatment during the relevant period was provided at the VA by Nurse Kathleen Sullivan, a psychiatric clinical nursing specialist who began seeing Plaintiff somewhat regularly in 2010. Tr. 787. In all, she appears to have seen him six times between March 2011 and January 2013; at most of these appointments, she prescribed psychiatric medication, reviewed the status of his prescriptions and performed mental status examinations. Tr. 274-77, 255-62, 252-55, 713-15, 773, 757. In addition, he saw various other VA providers, including social workers and a pharmacy specialist; these professionals assisted

him with housing, benefits and medication, but did not provide mental health treatment, although they occasionally recorded observations. See, e.g., Tr. 333-36, 539, 715, 732.

The relevant mental health history begins four days before the alleged date of onset (March 8, 2011), when Nurse Sullivan had an unscheduled walk-in appointment with Plaintiff who came because of a recent increase in anxiety following the hearing on his prior SSI/DIB applications. Tr. 274-77. During the appointment, he told her that Trazodone helped him "stay on an even keel, not get agitated." He denied suicidal or homicidal ideation, hallucinations, paranoia and substance abuse and presented no evidence of affective lability or loss of behavioral control. Tr. 275. On mental status examination, her findings were largely normal, including that Plaintiff's attention and concentration and recall of personal history were intact, but that, "[m]ood is somber with some increase in anxiety past two weeks due to SSDI hearing." Tr. 275. She recorded diagnoses of depressive disorder NOS and PTSD-related symptoms due to childhood trauma, with a Global Assessment of Functioning ("GAF")[1] score of 60. Tr. 266.

On March 29, 2011, Plaintiff met with a VA social worker about his SSI application. She noted that he was alert and oriented, with good affect, a little disheveled but able to perform activities of daily living independently; he denied difficulties with mood, suicidal or homicidal ideation or psychosis. Tr. 538. Two days later, on March 31, 2011, Plaintiff had an appointment with a pharmacy specialist at the VA, during which he stated that his mood had improved since

---

[1] The Global Assessment of Functioning ("GAF") scores relevant to this case are in both the 51 – 60 range, which indicates "moderate difficulty in social, occupational, or school functioning," and the 41 – 50 range, which indicates "serious impairment in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders, Text Revision 32–34 (4th ed. 2000) ("DSM–IV–TR"). While use of GAF scores was commonplace at the time of Plaintiff's treatment, "[i]t bears noting that a recent [2013] update of the DSM eliminated the GAF scale because of 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" Santiago v. Comm'r of Soc. Sec., No. 1:13-CV-01216, 2014 WL 903115, at *5 n.6 (N.D. Ohio Mar. 7, 2014) (citing Diagnostic and Statistical Manual of Mental Disorders at 16 (5th ed. 2013) ("DSM–V")). In response, the Social Security Administration ("SSA") released an Administrative Message (AM–13066, July 22, 2013) ("SSA Admin Message") to guide "State and Federal adjudicators . . . on how to consider . . . GAF ratings when assessing disability claims involving mental disorders." It makes clear that adjudicators may continue to receive and consider GAF scores. See SSA Admin Message at 2-6, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx? id=51489 (starting at p.19 of PDF document) (last visited June 29, 2015).

Trazodone was increased; he denied sleep disorder or suicidal or homicidal ideation. Tr. 333-36 ("[d]enies new problems xince last visit.")

On July 8, 2011, Plaintiff returned to Nurse Sullivan. She wrote in her notes that the visit was to address his difficulty modulating his mood, coping with depression, and problems establishing and maintaining interpersonal relationships, but also to complete the evaluation for "Social Security claim." Tr. 255-56. She prepared a lengthy report that lays out Plaintiff's mental health history; she included her current mental status observations that Plaintiff's thought was logical, coherent and goal directed, he modulated his mood, was managing interpersonal interactions appropriately and his recall, memory and concentration were all within normal limits. Tr. 260. She expressed optimism about Plaintiff's prognosis:

> Over the past two years Mr Beaudet has been able to give mental health services another try. He comes to psychiatric treatment now however late in the course of the illness. He also has the additional burden of changes in his overall health that he is tackling. In spite of those challenges I have seen this gentleman take step after step to improve his health over the past 2 years. I am optimistic in my belief that he will continue this.

Tr. 261. This report lists diagnoses of bipolar, PTSD related to childhood trauma and alcohol abuse in remission; it assesses Plaintiff's GAF at 46.[2] Tr. 261.

Nurse Sullivan next saw Plaintiff for treatment on August 24, 2011. Tr. 252-55. He reported increased anxiety and irritability and asked whether his current medications needed to be reevaluated. Tr. 252. He denied acting out impulsively or recklessly, affective lability or loss of behavioral control. Tr. 252. On mental status examination, apart from increased dysphoria and anxiety, his thought content was linear and goal-oriented with reality-based content; his attention, concentration and recall of personal history were intact. Tr. 253. Nurse Sullivan confirmed her diagnoses of bipolar disorder and PTSD related to childhood abuse. While she

---

[2] See n.1 supra.

thought Plaintiff might benefit from medication targeting bipolar, he "decline[d] treatments other than what we have used in past with some success. 'I don't want to be a zombie.'" Tr. 254. Nurse Sullivan assessed his GAF at 58.[3] Tr. 254.

On December 2, 2011, Plaintiff was hit by a car and hospitalized at Rhode Island Hospital for multiple broken bones and injury to a lung; early in his hospital stay, he left against medical advice because he was angry at not being allowed to smoke and was readmitted when he returned several hours later with shortness of breath and pain. Tr. 618. After release, he was seen on January 3 and 9, 2012, by VA social workers about housing because he could not return to the unheated basement in the winter while recovering from serious injuries. Tr. 728, 732. Initially, he stayed with his mother and a friend; he was referred to the Gateway Shelter with a plan to return to the basement as soon as the weather warmed up. Tr. 728. One of the social workers made mental status observations with largely normal findings, including that attention and concentration were adequate for the session, and assessed a GAF score of 48.[4] Tr. 733. Another social worker saw him on March 19, 2013, when he decided to leave Gateway to go back to the basement; after questioning him about this decision, she wrote, "no MH [mental health] or cognitive d/o [disorder] significantly impacting judgment." Tr. 715.

On May 31, 2012, Plaintiff saw Nurse Sullivan again. Tr. 713-15. He was wearing multiple clothing layers despite a temperature above 75 degrees; she observed poor hygiene, poor eye contact and dysphoric mood and recorded his report of emotional lability in social interactions, including "that he is always on the verge of 'losing it' if provoked on the street. Has not acted on these impulses however." Tr. 713. Nevertheless, she also found that he was alert and oriented, that his thought process was linear and goal-oriented with reality-based

---

[3] See n.1 *supra*.

[4] See n.1 *supra*.

content, he denied suicidal or homicidal ideation, his recall, attention and concentration were adequate and psychomotor was "wnl" [within normal limits], with normal, spontaneous speech. She noted that Plaintiff "refuses proper and appropriate treatment" for his mental impairment "but has agreed to use [T]razodone to manage agitation, poor sleep, and modulate mood somewhat over the past 4+ years." Tr. 713. Noting that he "[h]as some self awareness re his mental illness, avoids interactions with others as much as he can," she assessed his GAF at 44.[5] Tr. 713-14.

In September and October 2012, Plaintiff interacted with Nurse Sullivan and the VA social workers about his housing situation. Tr. 773. Nurse Sullivan's last appointment with Plaintiff prior to the hearing was either on November 21, 2012 (Tr. 787) or on December 2, 2012 (Tr. 757); there are no treatment notes in the record for either day.

## C.    Opinion Evidence

On October 19, 2011, state agency consultant psychologist Clifford Gordon, Ed.D., reviewed Plaintiff's records as of that date, opined that he suffers from severe affective and anxiety disorders (based on the VA diagnoses of bipolar and PTSD), but that his limitations in activities of daily living are mild while other limitations are moderate. Tr. 101. Dr. Gordon also assessed Plaintiff's mental residual functional capacity ("RFC"). With respect to concentration and persistence, he opined that Plaintiff can attend to basic and simple tasks, though he would make errors on detailed, complex tasks; with respect to social interaction, he opined that Plaintiff can relate adequately to others if contact is minimal and superficial, acknowledging that Plaintiff "can be emotionally reactive with others, isolated;" with respect to adaptation, he opined that Plaintiff can follow through on basic tasks, not complex/abstract tasks, and can adapt to ordinary changes in the work environment. Tr. 103-05. Shortly after this opinion was prepared,

---

[5] See n.1 *supra*.

Plaintiff's application was denied initially.  Tr. 106.  On January 5, 2012, a second state agency psychologist, Jeffrey Hughes, Ph.D., reviewed Plaintiff's updated records and also assessed severe affective and anxiety disorders.  Tr. 112-13.  Dr. Hughes concurred with Dr. Clifford's mental RFC.  Tr. 115-17.  Soon after, on February 3, 2012, reconsideration was denied.  Tr. 118.

Three days before Plaintiff's ALJ hearing, on January 8, 2013, Nurse Sullivan completed a Mental RFC Assessment form, together with a detailed "psychiatric evaluation"[6] report covering topics ranging from family, psychosocial, employment and mental health history, to his disheveled appearance, to a mental status evaluation, to his multiaxial psychiatric diagnosis.  Tr. 783-87.

In the mental status examination results[7] that Nurse Sullivan submitted in connection with Plaintiff's SSI application, she opined that he was alert and oriented, though dirty, in worn soiled clothing, with poor hygiene, that his mood was depressed and anxious, that he reported emotional lability with social interaction, and that his thought process was linear, goal-oriented and reality-based, with guarded behavior, while remaining engaged in treatment.  Tr. 792.  She recorded observations of "slowed, shuffling, stooped" psychomotor function and limited attention and concentration.[8]  Tr. 792-93.  However, she found his recall of personal history adequate, his speech normal and his cognitive abilities unknown because they had never been

---

[6] Notwithstanding this title of the report, reflected in a cross reference in the "Substance Abuse Materiality Questionnaire," Tr. 786, the record does not reflect that Plaintiff was ever seen by a psychiatrist or that any psychiatrist played a role in developing the information contained in it.

[7] It is not clear from the record when this mental status examination was performed.  The report is dated January 8, 2013, but states "[l]ast in person visit with Vet 11/21/12."  Tr. 787.  However, there are no treatment notes reflecting a mental status examination on November 21, 2012.  Nurse Sullivan's last treatment notes reflecting the performance of a mental status examination are from May 31, 2012.  See Tr. 713-15.

[8] These two observations are materially different from the May 31, 2012, mental status examination: in May 2012, Nurse Sullivan found psychomotor "wnl" [within normal limits] and attention and concentration "adequate for this visit."  Tr. 713.

formally tested. Tr. 792-93. She assigned a GAF of 44,[9] which is the lowest of any that appear in the treating notes, except for the May 31, 2012, note. Compare Tr. 254 (GAF is 58), 261 (GAF is 46), 276 (GAF is 60), 732-33 (GAF is 48), with Tr. 714 (GAF is 44), 793 (same).

Nurse Sullivan's accompanying RFC opinion records marked limitations in virtually every sector. Tr. 783-86. With respect to understanding and memory, she opined to marked limitations in his ability to understand and remember both simple and detailed instructions. With respect to concentration and persistence, she opined to marked limitations in his ability to maintain attention and concentration for extended periods, to perform activities within a schedule, to maintain attendance and punctuality or to sustain an ordinary routine without special supervision. With respect to Plaintiff's ability to interact socially, she found marked limitations in his ability to work in coordination with or proximity to others without distraction, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or displaying behavioral extremes, and to maintain socially appropriate behavior and basic standards of neatness or cleanliness. Her findings with respect to adaptation reflect both moderate and marked limitations. See generally Tr. 783-84. She opined that Plaintiff's history of past substance abuse is not material to these findings. Tr. 786. Her opinion concluded with her belief that, in the absence of substance abuse, Plaintiff would not be able to work on a full-time, ongoing basis. Tr. 786.

## II.     Travel of the Case

Plaintiff filed his application on July 19, 2011. Tr. 167-75. It was denied initially, Tr. 122-24, and on reconsideration, Tr. 128-30. Following a hearing before the ALJ on January 11, 2013, the ALJ issued her February 6, 2013, decision finding that Plaintiff was not disabled at any

---

[9] See n.1 *supra*.

time since his SSI application date and was therefore not entitled to receive the requested benefits. Tr. 9-20. The Appeals Council denied Plaintiff's request for review, Tr. 1-4, rendering the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed this action.

## III.    The ALJ's Hearing and Decision

Plaintiff, represented by counsel, appeared and testified before the ALJ on January 11, 2013; a vocational expert ("VE") also testified. Tr. 62-63.

Plaintiff's counsel framed the issues in her opening statement, arguing that Plaintiff's claim of disability is based on his psychiatric impairments, affective disorder (bipolar) and anxiety disorder (PTSD). Tr. 65-66. Plaintiff testified to a variety of skills reflected in his prior work as a sign painter, machine operator, mechanic and photographer, but said that his problems dealing with the public and his back prevent him from working. Tr. 67. He explained that he lives in the basement apartment, with the permission of the landlord, who is also his friend. Tr. 68-69. He rides the bus, although other riders make him uncomfortable. Tr. 69. He prepares food in the microwave and avoids soup kitchens because other people are there; he shops for food "to be in and out of there and not deal with the public." Tr. 69-70. He goes daily to the library, usually in the morning when there are fewer people; he reads and uses the computer, ignoring other patrons. Tr. 70-71, 77. In addition to extensive reading of such novels, as a 3,000-page Stephen King set, he remains interested in the arts and still owns several cameras. Tr. 71-72. Other than the friend who owns the building where he lives, Plaintiff sees his mother once a week to once a month, but is not close to her. Tr. 73. He claimed to see Nurse Sullivan once a week or every other week[10] and that she has been helpful. Tr. 76-77. Under examination by his attorney, Plaintiff testified that he is either awake or asleep for three or four days at a time and that extended wakefulness makes him feel angry, "ready, you know, to, to, to kill, you

---

[10] The treating notes do not confirm this frequency of contact.

know." Tr. 78, 80. He stopped getting into verbal or physical fights, after "I became solitary, about five years ago." Tr. 78. He no longer does any drawing and claims he can only read or use a computer for twenty to thirty minutes at a time. Tr. 80-81. When he goes out, he frequently forgets things, like his cigarettes or his phone. Tr. 81.

The VE testified that Plaintiff's past work was semiskilled or skilled, except for unskilled work as a cleaner. Tr. 82-83. In response to the ALJ's hypothetical, VE opined that, other than the cleaning job, Plaintiff's past work could not be performed by a hypothetical claimant sharing Plaintiff's vocational background who was limited to performing medium exertional work, occasionally climbing or crawling, with the ability to understand, remember and carry out only simple, routine, familiar, repetitive, object-oriented tasks and only occasionally interact with supervisors, co-workers and the general public. Tr. 83-84. However, these limitations are compatible with various unskilled jobs at the light and medium exertional levels, such as general factory work and cleaning occupations. Tr. 84-85. Adding a moderately severe limitation in social interactions causing workplace disruption for fifteen minutes a week did not affect the VE's answer, but if such disruption occurred over ten to fifteen percent of the workday, it would preclude regular gainful employment. Tr. 85. Similarly, missing one and a half days of work per month or moderately severe limitations in concentration, persistence or pace would preclude any work. Tr. 85.

In her decision, the ALJ employed the familiar five-step sequential evaluation process, see 20 C.F.R. § 416.920, finding at Step One that Plaintiff had not engaged in substantial gainful activity since July 19, 2011, his SSI application date. Tr. 11. At Steps Two and Three, the ALJ found that Plaintiff's liver disease, degenerative disc disease, diabetes mellitus, affective

disorder, and anxiety related disorder were severe impairments, but that they did not meet or medically equal the requirements of a Listing.  Tr. 11-12.

At Step Four, the ALJ made functional findings in reliance on the objective medical evidence and the opinion evidence; in making these findings, she concluded that Plaintiff's subjective complaints were not entirely credible and afforded Nurse Sullivan's RFC opinion little weight because it is not supported either by her treating notes or by the other objective medical evidence.  Tr. 15-18.  Based on these findings, the ALJ determined that Plaintiff retained the RFC to perform medium work, with additional limitations to occasional climbing and crawling; understanding, remembering, and carrying out simple, routine, familiar and repetitive object-oriented tasks; and only occasional work-related interactions with supervisors, coworkers and the general public, but could not perform any of his past work.  Tr. 14, 19.  At Step Five, the ALJ relied on the VE's testimony to find that Plaintiff could perform several jobs and concluded that Plaintiff was not disabled from July 19, 2011, through the date of her decision.  Tr. 19-20.

## IV.    Issues Presented

Plaintiff's motion for reversal rests on his arguments that the ALJ gave insufficient weight to Nurse Sullivan's RFC opinion and failed to follow the proper standards for assessing Plaintiff's credibility.

## V.    Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999). Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied). Thus, the Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner. Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)). "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts." Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)). A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence. See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 416.929(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991). Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and

the evidence establishes without any doubt that the claimant was disabled. Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, Sentence Six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g). To remand under Sentence Six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is

good cause for failure to submit the evidence at the administrative level.  See Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 139-43 (1st Cir. 1987).

With a Sentence Six remand, the parties must return to the Court after remand to file modified findings of fact.  Jackson, 99 F.3d at 1095 (citing Melkonyan v. Sullivan, 501 U.S. 89, 98 (1991)).  The Court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings.  Id.

## VI.  Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(I); 20 C.F.R. § 416.905.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 416.905-911.

### A.  Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 416.927(c).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of

Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 416.927(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 416.927(c)(2).

A treating source who is not a licensed physician or psychologist[11] is not an "acceptable medical source." 20 C.F.R. § 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p, 2006 WL 2263437, at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an

---

[11] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p, 2006 WL 2263437, at *1.

impairment, including its impact on the individual's ability to function.  Id. at *2-3.  In general, an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. §§ 416.945-946, or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.      The Five-Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 416.920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. §

416.920(e)-(f). Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of disabled is warranted. Id. § 416.920(g). Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993). The claimant must prove the existence of a disability on or before the last day of insured status for the purposes of disability benefits. 42 U.S.C. § 416(i)(3); Deblois, 686 F.2d at 79. If a claimant becomes disabled after loss of insured status, the claim for disability benefits must be denied despite disability. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C. Making Credibility Determinations

In determining the credibility of an individual's statement, the ALJ must consider the entire case record, including the objective medical evidence, the individual's own statement about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms. SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996). Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the

credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir.

1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly

articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia,

829 F.2d at 195.  A lack of a sufficiently explicit credibility finding becomes a ground for

remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681

F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a

credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly

discredit such testimony or the implication must be so clear as to amount to a specific credibility

finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720

F.2d 1251, 1255 (11th Cir. 1983)).

### D. Harmless Error

"A[n] ALJ's error is harmless where it is 'inconsequential to the ultimate nondisability

determination.'" Rivera v. Comm'r of Soc. Sec. Admin., No. 12-1479, 2013 WL 4736396, at

*11 (D.P.R. Sept. 3. 2013) (quoting Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012)).  If

the likely outcome on remand is clear and the same as that reached by the ALJ, the error is

harmless and the court may uphold the denial of benefits.  Ward v. Apfel, No. 98-168-B, 1999

WL 1995199, at *3 (D. Me. June 2, 1999).  Error is not harmless "[w]hen an agency has not

considered all relevant factors in taking action, or has provided insufficient explanation for its

actions . . ." Lyons ex rel. X.M.K.L. v. Astrue, No. 12-30013, 2012 WL 5899326, at *7 (D.

Mass. Nov. 26, 2012) (quoting Seavey, 276 F.3d at 12).  The ALJ has "an obligation to the

claimants and to the reviewing court to make full and detailed findings to support his

conclusions." Lacroix v. Barnhart, 352 F. Supp. 2d 100, 107 (D. Mass. 2005).  Thus, it is

reversible error when the ALJ does not give good reasons for discounting the opinion of the

treating physicians, even if the court can find good reasons to discount the opinion. Sargent v. Astrue, No. 11-220 ML, 2012 WL 5413132, at *9 (D.R.I. Sept. 20, 2012). Similarly, if the ALJ finds that the claimant is not credible, he must fully explicate his reasons; if he does not, the court must reverse for the failure to comply with Avery, 797 F.2d at 29, and SSR 96-7p. See Sargent, 2012 WL 5413132, at *12.

## VII. Application and Analysis

### A. Weight Given to Nurse Sullivan's RFC Opinion

Plaintiff argues that Nurse Sullivan's RFC opinion is entitled to deference, if not controlling weight, even though she is not an "acceptable medical source," because of her long-standing treating relationship as Plaintiff's primary psychiatric provider. Pointing to the mental status examinations that she performed over several years, coupled with the absence of any other psychiatric or psychological examination by a consulting agency psychologist or psychiatrist, he contends that it was error to afford Nurse Sullivan's opinion little weight.

Plaintiff's argument misses the point. The ALJ did not discount Nurse Sullivan's opinion merely because she is not a psychologist or psychiatrist.[12] Rather, the ALJ's decision makes clear that she took both the length of the treating relationship and Nurse Sullivan's credentials as a "psychiatric clinical nurse specials [sic]" into consideration. Tr. 18. Nurse Sullivan's RFC opinion was afforded little weight because it is neither supported by nor consistent with Nurse Sullivan's treating notes and it is inconsistent with the other objective evidence in the record. Whether that finding – that Nurse Sullivan's opinion is "not supported by treatment notes or

---

[12] The Commissioner now emphasizes that Nurse Sullivan, as a psychiatric clinical nurse specialist, is not an "acceptable medical source" under the applicable regulations, which is a factor that may justify giving that opinion less weight than one from an "acceptable medical source." See 20 C.F.R. § 416.913(a) (acceptable medical sources include licensed physicians and licensed or certified psychologists). However, that was not emphasized by the ALJ as material to the determination that her opinions should be afforded little weight.

other objective medical evidence of record" – is properly based on substantial evidence must be the focus of this Court's inquiry. Tr. 18.

The analysis begins with the somewhat mysterious mental status observations included with Nurse Sullivan's RFC opinions. With no indication as to when this examination was performed, including the extent to which it may simply reflect the May 31, 2012, results with certain amendments, it is difficult to conclude that these are treatment notes, rather than a report prepared based on prior observations for submission in connection with Plaintiff's application. Assuming that they are treatment notes, it must then be observed that these findings support some, but are inconsistent with others, of Nurse Sullivan's RFC conclusions. For example, her examination notes provide that "attention and concentration" are "limited" while her RFC opinion is that attention and concentration are markedly limited. Compare Tr. 792-93, with Tr. 783. Similarly, her examination report indicates that Plaintiff's recall of his personal history is "adequate" while she could not opine on his cognitive abilities because they had not been tested; these observations contrast with her RFC findings that Plaintiff is markedly limited in his ability to understand or remember even short and simple instructions or to carry out detailed instructions. Compare Tr. 793, with Tr. 783.

More important are the four mental status examinations that Nurse Sullivan unambiguously documented in her treatment notes as having been performed over the course of treatment from early 2011 until mid-2012. These are materially inconsistent with the RFC opinions in her January 8, 2013, assessment.

Starting with attention and concentration, Nurse Sullivan's treating notes consistently assessed Plaintiff's ability as "intact," "wnl [within normal limits]," or "adequate," Tr. 253, 260, 275, 713, a conclusion that the ALJ found was buttressed by Plaintiff's testimony about his

extensive reading and going to the library. Tr. 19. These treating notes contrast starkly with Nurse Sullivan's RFC of January 8, 2013, which found Plaintiff's ability to pay attention and concentrate to be markedly limited. Tr. 783. Similarly, Nurse Sullivan's July 8, 2011, treating note indicates that Plaintiff is "[r]eliable, responsible, thorough if asked to complete a task such as obtain a form, make call," though he was "forgetful at times;" similarly, she observed in both March and August 2011 that his recall is "intact." Tr. 253, 260, 275. These findings are inconsistent with the RFC finding that Plaintiff is markedly limited in his ability to understand and remember both short and simple instructions as well as detailed instructions. Tr. 783. Finally, to the extent that her RFC opinions are reliant on diminished cognitive capacity, her notes make clear that no testing of Plaintiff's cognition was ever conducted; accordingly, those aspects of her opinion are not "supported by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 416.927(c)(2).

The most significant aspect of Nurse Sullivan's RFC opinion relates to Plaintiff's ability to interact with the general public, get along with co-workers and respond appropriately to supervisors; she opined to marked limitations in every facet of social interaction, except for his ability to ask simple questions, as to which she found him moderately limited. Tr. 784. These extreme opinions contrast with her treating notes of March 8, 2011, which indicate that Plaintiff's medication kept him "on an even keel, not get agitated" and that there was "no evidence of affective lability or loss of behavioral control." Tr. 275. Her mental status examination from that appointment includes her observation that "[n]o emotional lability, no mania no anger management concerns now." Id. Similarly, at his August 2011 appointment, Nurse Sullivan reiterated her observation of "no evidence of affective lability or loss of behavioral control," even though Plaintiff reported increased anxiety and irritability. Tr. 252.

When Plaintiff reported at the May 31, 2012, appointment that "he is always on the verge of 'losing it' if provoked on the street," he also reported that he "[h]as not acted on these impulses." Tr. 713. As the ALJ noted, these treating observations by Nurse Sullivan are consistent with other evidence in the record; for example, Plaintiff is able to maintain limited social interaction while using public transportation, attending medical appointments, shopping at the grocery store and spending time at the library. Tr. 18. Also consistent with Nurse Sullivan's treating notes, but inconsistent with her RFC opinion, is the objective fact that she never referred Plaintiff for intensive in-patient, out-patient or emergency room treatment. Tr. 17-18.

Finally, Plaintiff points to Plaintiff's GAF scores, arguing that Nurse Sullivan frequently assessed GAF ratings that indicate serious symptoms and that these constitute support for the extreme limitations in her RFC opinion. This argument ignores the range of GAF scores to which Nurse Sullivan opined in her treating notes over the course of the period of alleged disability. While she certainly opined to scores below 50, once as low as 44, she also assigned scores above 50, one as high as 60, which reflects only moderate difficulty in functioning. Pursuant to the most recent guidance on the use of GAF scores by disability adjudicators, there is a reference to research suggesting that the highest GAF score assigned over the course of treatment may well be the more appropriate indicator of a claimant's ability to function. SSA Admin Message, available at http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=51489. In additional, this guidance provides that a GAF rating is a medical opinion only if it comes from an acceptable medical source, which Nurse Sullivan is not. Id.; see Phan v. Colvin, No. CA 13-650L, 2014 WL 5847557, at *12 (D.R.I. Nov. 12, 2014). These GAF ratings do not provide substantial objective evidence supporting Nurse Sullivan's RFC opinion.

All in all, while the evidence certainly establishes that Plaintiff's impairments impose a significant degree of interpersonal difficulty, it also buttresses the ALJ's conclusion that these limitations are not as preclusive as Nurse Sullivan's RFC opinion states. Mindful that it is Plaintiff's burden to provide evidence to support his allegations of disabling mental impairments, 20 C.F.R. § 416.912(c), Freeman, 274 F.3d at 608, and that substantial evidence is "more than a mere scintilla," Richardson, 402 U.S. at 401, I find that the ALJ committed no error in concluding that Nurse Sullivan's treating notes, as well as the other objective evidence, do not support the extreme functional limitation that she endorsed in her RFC opinion. Accordingly, I find that there is substantial evidence to support the ALJ's determination to afford her RFC opinion little weight.

**B.      Credibility Assessment**

Plaintiff contends that the ALJ failed properly to consider his subjective complaints in light of the totality of the record as required by Social Security Ruling 96-7p because of error in making her adverse credibility finding. Specifically, Plaintiff challenges the ALJ's reliance on Plaintiff's failure to seek, and decision to decline, more aggressive forms of mental health treatment as one of the foundations for her credibility finding. Plaintiff argues that his failure to seek more than routine treatment results from the success of his strategy of isolating himself from others and modulating his activities in such a way as to reduce his interaction with others. In addition, he claims that the ALJ ignored his explanations for his decision to decline other forms of treatment, "other than what was prescribed in the past with some success," that is, his history of abuse by a mental health provider when he was a child and his desire to avoid medication that would turn him into a "zombie."

In considering this critique of the ALJ's credibility determination, this Court must be mindful of the need to tread softly. Cruz v. Astrue, No. 11-638, 2013 WL795063, at *16 (D.R.I. Feb. 12, 2013). "It is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991). The ALJ's credibility determination, which is based upon her observation of Plaintiff, evaluation of demeanor and consideration of how his testimony fits in with the rest of the evidence, is entitled to deference. Frustaglia, 829 F.2d at 195. Nevertheless, when critical aspects of the ALJ's credibility determination are based on suppositions that do not constitute substantial evidence, remand is necessary. Morin v. Sec'y of Health & Human Servs., 835 F. Supp. 1414, 1427 (D.N.H. 1992) (credibility finding not supported by substantial evidence cannot stand).

The argument that the ALJ failed to consider Plaintiff's use of social isolation and a solitary lifestyle to manage his mental health symptoms may be disposed of quickly. Review of her decision makes clear that the ALJ was well aware that Plaintiff both avoids others and uses medication to "help with his agitation, low frustration tolerance, and severe anxiety when he has to be out in the community." Tr. 13, 17. In finding moderate functional limitations in Plaintiff's social interaction capabilities, the ALJ specifically examined Plaintiff's reliance on a mix of medication and self-isolation and found that these strategies have controlled his symptoms sufficiently to allow him to engage in a range of activities that require some social contact, such as his daily trips to the library and the grocery store, and to live for a limited period in a homeless shelter when he could not live alone while recovering from the motor vehicle accident. Tr. 13, 17-18; see Tr. 713 (while at shelter, he increased Trazodone use during day; when it made him sleepy, he "decreased interaction with other residents"). Neither while living in the

shelter, nor at any other time, as the ALJ found, did these contacts with other people result in the need for "hospitalizations or frequent emergency room treatment or treatment notes indicating that the claimant's symptoms have not been well-controlled with medication." Tr. 18. Nurse Sullivan's treating notes confirm that, despite the use of "social isolation and a solitary lifestyle to manage his symptoms," Plaintiff's engagement with treatment had resulted in him taking "step after step to improve his health over the past 2 years." Tr. 261. I find that the ALJ appropriately considered Plaintiff's use of a solitary lifestyle to manage his symptoms in reaching her conclusion that his claim of being completely unable to interact with others lacked credibility.

By contrast, Plaintiff is right that the ALJ's credibility analysis references as significant Plaintiff's decision to decline treatment "other than what was prescribed in the past with some success," without mention of the two reasons that caused him to decline suggested treatment. Tr. 17. Specifically, with no reference to the explanations, the ALJ focused on Nurse Sullivan's treating notes for May 31, 2012, which state: "[r]efuses medication other than trazodone, fortunately this med provides some help with agitation, low frustration tolerance, severe anxiety when he has to be out in community; also helps with sleep," and "Vet refuses proper and effective treatment for [bipolar] disorder but has agreed to use trazodone to manage agitation, poor sleep and modulate mood somewhat over the past 4+ years." Tr. 713, 780. Plaintiff points to the language in SSR 96-7p, which specifies that an adjudicator may not draw adverse inferences from the failure to seek or pursue medical treatment "without first considering any explanations that the claimant may provide, or other information in the record, that may explain the infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, at *7; see 20 C.F.R. § 416.930; SSR 82-59, 1982 WL 31384 (Jan. 1, 1982). The

ALJ's decision is devoid of any suggestion that she considered Plaintiff's explanations as required by SSR 96-7p.

Consideration of whether this omission is error undermining the ALJ's credibility finding must begin with an examination of what the record says about the reasons for Plaintiff's decision to decline certain treatment. The first relevant reference is Nurse Sullivan's detailed report dated July 8, 2011; in a section laying out Plaintiff's history, she wrote, "[t]he other costs paid as a result of this high profile abuse scandal were the negative impact on [Plaintiff's] willingness to seek psychiatric treatment, capacity to trust mental health practitioners and others in position of power."[13] Tr. 257. The same observation is repeated in the report she submitted on January 8, 2013, in support of Plaintiff's SSI application. Tr. 789. Next is Nurse Sullivan's treating note for August 24, 2011, which indicates, "[m]ight benefit from medication targeting bipolar history but declines treatments other than what we have used in past with some success. 'I don't want to be a zombie.' . . . Control over his environment given hx [history] of childhood trauma and abuse important consideration." Tr. 254.

In making her adverse credibility finding, the ALJ does not indicate whether she considered either of these explanations. See Billings v. Astrue, No. CIV. 09-183-B-W, 2009 WL 5218074, at *6 (D. Me. Dec. 30, 2009) (ALJ committed error in failure to address explanation in record for sporadic mental health treatment when drawing negative credibility inference). As the cases addressing the issue make clear, the failure to consider explanations in the record for the lack of treatment, while relying on the lack as the foundation for an adverse credibility inference, constitutes error. See, e.g., Bates v. Colvin, 736 F.3d 1093, 1098 (7th Cir. 2013) (because standard of review employed for credibility determinations extremely deferential, and ALJ did

---

[13] While the ALJ's decision mentions that Plaintiff experienced sexual abuse in childhood, Tr. 15, she does not link that reference to her comments on the failure to seek treatment.

provide some evidence supporting her determination, erroneous failure to consider explanation for failure to seek treatment not enough to render credibility determination "patently wrong"); LaRiccia v. Comm'r of Soc. Sec., 549 F. App'x 377, 387 (6th Cir. 2013) (ALJ's failure to consider explanation that claimant could not find any in-network providers after moving to Ohio rendered adverse credibility finding reversible error); Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 547 (3d Cir. 2003) (reversible error for ALJ to draw adverse credibility inference but not consider claimant's explanation that she could not afford treatment); Perry v. Colvin, No. CIV.A. 13-40094-TSH, 2015 WL 1227822, at *9 (D. Mass. Mar. 18, 2015) (ALJ's failure to consider explanations for irregularities in claimant's treatment history constituted legal error and may have altered evaluation of credibility).

Mindful of the deference to which the ALJ's credibility determination is entitled, Frustaglia, 829 F.2d at 195, the next task for this Court is to consider whether this error so taints the ALJ's detailed credibility analysis as to require remand for a do-over. Two points are pertinent to the harmless error analysis. First, most of the record references relate to Plaintiff's disinclination to try a different medication than Trazodone, which had been effective in reducing his symptoms for several years. Second, the other record reference relates to a general aversion to psychiatric treatment and incapacity to trust mental health practitioners and others in positions of power. The issue then is whether the ALJ's adverse credibility finding is still supported by substantial evidence if the Court disregards any adverse inference from either Plaintiff's failure to accept Nurse Sullivan's suggestions that he try another medication or from Plaintiff's failure to seek treatment from a psychiatrist, instead of from the nurse and social workers he saw at the VA. See Souza v. Barnhart, No. 03-73-P-C, 2003 WL 22961213, at *4 n.3 (D. Me. Dec. 15, 2003) (ALJ's error in failing to consider explanations before drawing inferences about symptoms

and functional effects from lack of medical treatment is harmless because ALJ proffered alternative reason for questioning claimant's credibility).

In this instance, the ALJ's credibility finding is neither terse nor sparse. To the contrary, when Plaintiff's declination of other medication or treatment is excluded, her conclusion that Plaintiff's complaints of disabling mental functional limitations are less than fully credible remains grounded in a number of well-supported reasons. First, the ALJ focused on the longitudinal treatment record, which documents that his symptoms have been well-controlled with medication. Tr. 17. Next, she noted that Plaintiff "has not required intensive Outpatient or inpatient treatment;" this reference is to the fact that such treatment has never been required, not to Plaintiff's disinclination to seek it. Id. Third, the adverse credibility finding looked to the many record references establishing that Plaintiff can function in a limited way with other people (at the grocery store, the library and the homeless shelter) without posing a danger to himself or others. Id. at 17-18. Fourth, the ALJ relied on the treating notes stating that Plaintiff "did not present any physical or cognitive limitations to learning and communicating." Id. at 17. Fifth, the ALJ's credibility analysis took note of the mental status finding that Plaintiff's psychomotor status was within normal limits, despite arriving for a medical appointment wearing layers of clothing and with poor hygiene. Id. Finally, the ALJ considered the record references establishing Plaintiff's ability to perform a wide range of activities of daily living, such as the use of public transportation, daily shopping, trips to the library and his pleasure in reading the entirety of a Stephen King set of novels. Id. at 18-19.

This is more than enough. It plainly establishes that the ALJ's assessment of the credibility of Plaintiff's subjective complaints is well supported by other substantial evidence. Accordingly, I find harmless the ALJ's error in failing to comply with SSR 96-7p's mandate that

explanations for the failure to seek treatment must be considered if the failure is relied on for an adverse credibility finding. <u>Souza</u>, 2003 WL 22961213, at *4 n.3; <u>Roth v. Colvin</u>, No. C12-2189-RSM, 2013 WL 3852884, at *5 (W.D. Wash. July 24, 2013) (ALJ erroneously failed to consider possible explanations for not seeking treatment, error harmless when ALJ provided other sufficient reasons for finding); <u>cf.</u> <u>Brown v. Comm'r of Soc. Sec.</u>, 425 F. App'x 813, 817 (11th Cir. 2011) (per curiam) (improper adverse inference for not seeking treatment based on inability to pay is harmless when gap in treatment did not play major role in ALJ's decision).

**VIII.** <u>**Conclusion**</u>

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 10) be DENIED and Defendant's Motion for Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party. <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision. <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008); <u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 6, 2015